PROPOSED ORDER "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

SCHOOL DISTRICT OF
PHILADELPHIA,                                        CIVIL ACTION

        Plaintiff,

        v.

DEBORAH A.,
Parent and Natural Guardian
of CANDISS C., a Minor,

        Defendant.                           No. 08-2924

---

## <u>ORDER</u>

AND NOW, this _____ day of_____, 2009, upon consideration

of the Motion for Remand filed by Deborah A. and Candiss C., and any Response thereto, it is

hereby ORDERED that the Motion is GRANTED, and this matter is REMANDED to the

Pennsylvania Special Education Administrative Process for consideration of the claims of

Deborah A. and Candiss C. prior to July 25, 2005 without imposition of a limitations period.


BY THE COURT:


_____
SCHILLER,                    J.

PROPOSED ORDER "B"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

SCHOOL DISTRICT OF
PHILADELPHIA,                                                    CIVIL ACTION

                  Plaintiff,

        v.

DEBORAH A.,
Parent and Natural Guardian
of CANDISS C., a Minor,

                Defendant.                          No. 08-2924

---

## ORDER

AND NOW, this _____ day of_____, 2009, upon consideration

of the Motion for Judgment on the Administrative Record Remand filed by Deborah A. and

Candiss C., and any Response thereto, it is hereby ORDERED that the Motion is GRANTED,

and that the award of compensatory education by the Pennsylvania Special Education

Administrative Process in favor of Candiss C. for the 2006-2007 school year is hereby

AFFIRMED.  It is FURTHER ORDERED that Candiss C. is entitled to compensatory education

services for the Summer of 2007. It is FURTHER ORDERED that Candiss is entitled to

compensatory damages, the precise nature and amount of which will be determined upon further

proceedings.

BY THE COURT:

_____

SCHILLER,                          J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SCHOOL DISTRICT OF
PHILADELPHIA,                                       CIVIL ACTION

                    Plaintiff,

            v.

DEBORAH A.,
Parent and Natural Guardian
of CANDISS C., a Minor,

                    Defendant.                      No. 08-2924

---

**MOTION OF DEBORAH A. AND CANDISS C. FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD AND MOTION FOR REMAND**

  Deborah A. and Candiss C.[1], through undersigned counsel, hereby file this Motion for

Judgment on the Administrative Record and Motion for Remand, and in support thereof state as

follows:

  1.  On January 17, 2008, following a special education administrative due process

    hearing, a Pennsylvania Special Education Hearing Officer issued a written

    Opinion and Order finding that the School District of Philadelphia ("District")

    denied Candiss C. a free appropriate public education ("FAPE") during the 2006-

    2007 school year, thereby violating Candiss C.'s civil and educational rights.  The

    Hearing Officer therefore awarded Candiss C. two (2) hours per day of

---

[1] Deborah A. is both a Defendant in case number 08-2924, and a Plaintiff in case number
08-2613. Candiss C. is not a party to the District's appeal at case number 08-2924, but is a
Plaintiff in the Family's appeal at number 08-2613.  The Court has consolidated these related
appeals under the docket number 08-2924 in which Deborah A. is the only Defendant.  For
purposes of clarity, Deborah A. and Candiss C. will be referred to herein as the "Family."

compensatory education for every school day Candiss attended school during the 2006-2007 school year.

2.    The District appealed the Hearing Officer's decision to a Pennsylvania Special Education Appeals Panel ("Appeals Panel").  Because the Hearing Officer awarded only two (2) hours per day of compensatory education, improperly applied a statute of limitations to Candiss C.'s compensatory education claims and therefore limited these claims to begin no earlier than July 25, 2005, and failed to award compensatory education for the Summer of 2007, Deborah A. also appealed those portions of the Hearing Officer's decision to the Appeals Panel.

3.     By written decision dated March 5, 2008, the Appeals Panel correctly increased Candiss's award of compensatory education during the 2006-2007 school year from two (2) hours per day to five and one half (5 ½) hours per day from November 1, 2006 through the end of the 2006-2007 school year, but incorrectly affirmed the Hearing Officer's decision in all other respects.

4.    On or about May 2, 2008, the District filed a Petition for Review of the Appeals Panel's decision in the Commonwealth Court of Pennsylvania. On June 4, 2008, the Family filed an appeal of the Appeals Panel decision in the United States District Court for the Eastern District of Pennsylvania pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. Section 1400 et seq. and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C.A. Section 794. The Family's Complaint was docketed at Number 08-2613.

5.      On June 23, 2008, Deborah A. removed the School District's action initiated in Commonwealth Court to this Court, and that matter was docketed as Number 08-2924.

6.      By Order dated November 12, 2008, this Court granted the parties' Joint Motion to Consolidate these actions under case number 08-2924.

7.      This Court has original jurisdiction over these appeals pursuant to 28 U.S.C. § 1331 because these cases raise federal questions under the IDEA and Section 504.

8.      Previously, the claims giving rise to this appeal were exhausted at the administrative level by a Pennsylvania Special Education Hearing Officer and a Special Education Appeals Panel with authority to hear special education matters. The Hearing Officer conducted a hearing in this matter, and developed an administrative record.

9.      Inasmuch as the administrative process erred as a matter of law in applying a two year limitations period under IDEA-2004 to the Family's claims which existed prior to the effective date of the Act, in violation of Supreme Court and Third Circuit authority, and also otherwise improperly applied IDEA-2004's limitations period as an inflexible, automatic two year period to bar the Family's claims, the Family respectfully requests that this Court remand the matter to the administrative process for consideration of the Family's compensatory education claims without the imposition of a statute of limitations for claims prior to July 25, 2005.

10.     All evidence and information regarding the School District's liability for compensatory education and other damages sought by the Family is contained in

3

the administrative record, rendering trial in this matter unnecessary, except for the

amount of monetary damages which the Family submits may be determined

through further proceedings.

**WHEREFORE**, it is respectfully requested that this Honorable Court render decision in

favor of the Family in this matter on the basis of the administrative record, and further remand

this matter to the administrative process for consideration of their claims prior to July 25, 2005

without imposition of a statute of limitations.

Respectfully Submitted,


By: /s/_____
Gabrielle C. Sereni, Esquire
Attorney I.D. #83899

/s/_____
Heather Hulse, Esquire
Attorney ID # 164134
MCANDREWS LAW OFFICES
Attorneys for the Family
30 Cassatt Avenue
Berwyn, PA 19312
(610) 648-9300 (phone)
(610) 648-0433 (fax)

4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

SCHOOL DISTRICT OF
PHILADELPHIA,                                              CIVIL ACTION

           Plaintiff,

      v.

DEBORAH A.,
Parent and Natural Guardian
of CANDISS C., a Minor,

           Defendant.                         No. 08-2924

---

**MEMORANDUM IN SUPPORT OF MOTION OF DEBORAH A. AND CANDISS C.
FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND MOTION FOR
REMAND**

## I.    INTRODUCTION

These actions involve cross-appeals by the parties to a special education administrative

due process hearing and appeal in which a Pennsylvania Special Education Appeals Panel

("Appeals Panel") properly awarded Candiss C., a minor child with disabilities, five and one half

(5 ½) hours per day of compensatory education from November 1, 2006 through the end of the

2006-2007 school year.  However, the administrative process improperly applied a statute of

limitations to Candiss C.'s compensatory education claim, limiting this claim to begin no earlier

than July 25, 2005, and failed to award compensatory education for the Summer of 2007.  Both

the Family and the School District of Philadelphia ("District") appealed the Appeals Panel's

decision.  The Family's appeal is brought pursuant to the Individuals with Disabilities Education

Act ("the IDEA"), 42 U.S.C. Section 1401 et seq.; and Section 504 of the Rehabilitation Act of

1973 ("Section 504"), 29 U.S.C.A. Section 794.

Candiss is a sixteen year-old child whom the District has identified as eligible for special education services under the IDEA due to a Specific Learning Disability within the meaning of that term under the IDEA.  See 34 C.F.R. Section 300.7 (c)(10).  Deborah A. is Candiss's mother and natural guardian.  While Candiss was a student residing in the District from the 1999-2000 through the 2006-2007 school year,[2] the District failed to fulfill the substantive and procedural requirements of the IDEA and Section 504, including the requirements to conduct appropriate educational evaluations, to create proper Evaluation Reports ("ERs") and to create and implement proper Individualized Education Programs ("IEPs"), thereby denying Candiss a free appropriate public education ("FAPE") under IDEA and Section 504.

On July 27, 2007, Deborah A. requested a special education due process hearing pursuant to 34 C.F.R. Sections 300.507(a) and 300.508 and 22 Pa. Code Chapter 14.162 seeking compensatory education from the 1999-2000 school year through the 2006-2007 school year (but excluding the 2005-2006 school year) and during the Summer of 2007 for the District's failure to fulfill its Child Find obligation under the IDEA and Section 504 by timely identifying Candiss as eligible for special education services under these statutes, as well as its failure to provide her with appropriate evaluations and IEPs during that period.

In a written decision dated January 17, 2008, the Hearing Officer correctly determined that the District had denied Candiss a FAPE during the 2006-2007 school year and that Candiss is therefore entitled to compensatory education for that failure.  However, the Hearing Officer incorrectly awarded Candiss only two (2) hours of compensatory education per day for each

---

[2]   The Family did not seek relief on the administrative level for the 2005-2006 school year during which Candiss attended a charter school and, thus, this period of time is not an issue before this Court.

2

school day Candiss attended school from November 1, 2006 until the end of the 2006-2007 school year.

The Hearing Officer also incorrectly applied a statute of limitations to Candiss's compensatory education claim under the IDEA and Section 504, limiting her claim to the two year period beginning on July 25, 2005 and refusing to take evidence prior to that period.  The Hearing Officer also incorrectly determined that the Family failed to meet the statutory exceptions to the time limitation addressed in the IDEA.  The Hearing Officer further erroneously determined that the continuing violations doctrine and tolling principles do not apply to compensatory education claims under the IDEA and Section 504. Finally, the Hearing Officer failed to award Candiss compensatory education for the District's failure to offer her a FAPE in the form of Extended School Year services ("ESY") during the Summer of 2007.

On March 5, 2008, a Special Education Appeals Panel correctly reversed the Hearing Officer's decision with regard to the amount of compensatory education due to Candiss during the 2006-2007 school year, increasing the award to five and one half (5 ½) hours per day for each school day Candiss attended school from November 1, 2006 to the end of the 2006-2007 school year. However, the Appeals Panel erroneously affirmed the Hearing Officer's decision in all other respects.

Deborah A. and Candiss C. therefore appealed the Appeals Panel decision in this Court requesting review and reversal of the Hearing Officer decision and of the Appeals Panel decision, with the exception of the Appeals Panel's award of compensatory education from November 1, 2006 through the end of the 2006-2007 school year.  The Family also seeks a remand to the Pennsylvania Special Education Hearing Officer for consideration of their compensatory education claims from the 1999-2000 school year through the 2004-2005 school year without

3

imposition of a statute of limitations. They also seek monetary damages under the IDEA and

Section 504 as a result of the District's failure to offer Candiss a FAPE from the 1999–2000

school year through the 2004-2005 school year and during the Summer of 2007, as well as

reasonable attorneys fees and costs.[3]

## II.   STANDARD OF REVIEW

This Court exercises plenary review over the conclusions of law reached by the

administrative process.  Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 83 (3d Cir.

1999); Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 758 (3d Cir. 1995); Carlisle Area Sch. Dist. v.

Scott P. 62 F.3d 520, 526 (3d Cir. 1995); Wexler v. Westfield Bd. of Educ., 784 F.2d 176, 181

(3d Cir. 1986) (reh'g denied).  In reviewing a dispute brought under the IDEA's administrative

hearing process, the district court is required to give "due weight" to the factual findings in the

state administrative proceedings. Rowley v. Board of Educ., 458 U.S. 176, 206-07 (1982).  The

concept of "due weight" has been defined by this Court as requiring the District Court to conduct

a "modified de novo" review of the factual decision of the administrative process below.  S. H. v.

---

[3] As prevailing parties on a significant issue on the administrative level, Candiss C. and
Deborah A. are entitled to their reasonable attorneys fees and costs under both the IDEA and
Section 504. J.O. v. Orange Twp. Bd. of Educ., 287 F.3d 267, 271 (3d Cir. 2002); Hensley v.
Eckerhart, 461 U.S. 424, 433 (1983); 20 U.S.C. Section 1415(i)(2)(3); 34 C.F.R. Sections
300.512, 300.513; 29 U.S.C. Section 794 (b).
    Additionally, Candiss C. and Deborah A. do intend to pursue compensatory damages
directly under IDEA and Section 504.  See W.B. v. Matula, 67 F.3d 484, 495 (3d Cir.
1995)(holding that monetary damages available under Section 504, and strongly intimating the
same under IDEA); Enright v. Springfield Sch. Dist., No. Civ. A. 04-1653, 2007 WL 4570970, at
*10 (E. D. Pa. Dec. 27, 2007)(Slip copy) (monetary damages awarded under IDEA and Section
504);  Damian J. v. School District of Philadelphia, No. 06-3866 (monetary damages available
under IDEA and Section 504); Brandon V. v. Chichester Sch. Dist. et al., No. 06-4687, 2007 WL
2155722 (E. D. Pa. July 25, 2007) (monetary damages available under Section 504). The liability
of the District for both compensatory education and compensatory damages is clear upon the
existing record and will be further informed by any record generated during remand; because the
extent of compensatory education may be decided on the completed record, the only fact-finding
which would remain after the Court's determination of the instant Motions would involve the
extent of compensatory damages. Id.

State-Operated Sch. Dist., 336 F.3d 260, 269-270 (3d Cir. 2003).  This requires the District Court

to consider factual findings made by the administrative process to be *prima facie* correct, and if

the court chooses not to accept these factual findings, it is required to explain why.  Id. at 270.

Only when non-testimonial, extrinsic evidence in the record, or the record read in its entirety,

would justify a contrary conclusion is the District Court is permitted to reject the factual findings

of a Hearing Officer.  Id.

The questions presented regarding the application of time limitations to a child's education

claims are pure legal issues involving plenary review.  The application of the IDEA's statutory

and regulatory requirements to the particular facts of a student's medical and educational needs is

a mixed question of law and fact, over which this Court exercises plenary review.  Wexler, Id.;

Muller v. Committee on Special Educ., 145 F.3d 95, 102 (2d Cir. 1998).

## III.   MOTION FOR REMAND[4]

### A.   The Administrative Process Incorrectly Applied An Inflexible, Automatic Two Year Limitations Period To Candiss's Compensatory Education Claims

#### 1. IDEA-2004 May Not Be Applied Retroactively to Destroy Claims Arising Prior to the Act's Effective Date

IDEA-2004's two-year limitations period may not be retroactively applied to automatically

destroy claims existing under IDEA-2004 prior to the effective date of the Act (July 1, 2005).

Such a retroactive application of a new statute of limitations contradicts controlling Supreme

Court and Third Circuit case law.  Tereance D. v. School Dist. of Philadelphia, 570 F.Supp.2d 739

---

[4] The Family recognizes that this Court recently ruled on a similar Motion for Remand filed by this office in Evan H. v. Unionville-Chadds Ford School District, No. Civ. A. 07-4990, 2008 WL 4791634 (E. D. Pa. Nov. 4, 2008).  However, in light of the fact that in Laura P. v. Haverford Sch. Dist., 2008 WL 5000461 (E. D. Pa. Nov. 21, 2008), a third federal judge in this Court, Judge Sanchez, has now joined Judges Yohn and Fullam in their determination that IDEA-2004 may not be applied retroactively, and in order to preserve the issue for appeal, the Family respectfully submits this issue for the Court's consideration. The Family notes that the issue of whether the Family has satisfied IDEA-2004's exceptions to the statutory limitations period is a fact-sensitive one, and therefore a determination that the Family has satisfied these exceptions is entirely possible consistent with Evan H.

(E. D. Pa. Aug. 5, 2008).  Indeed, Supreme Court precedent prohibits retroactive application of statutes of limitations absent express intent by Congress. In <u>Landgraf v. USI Film Products</u>, 511 U.S. 244 (1994), the Supreme Court explained that the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." <u>Id.</u> at 265.  Because there is a presumption against retroactive application of statutes, <u>Hughes Aircraft Co. v. U.S. ex rel. Schumer</u>, 520 U.S. 939, 946 (1997), "the courts, therefore, require from Congress a 'clear intent' that the law should apply to earlier conduct to 'assure[ ] that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits.'" <u>Id.</u>  "Congressional enactments…will not be construed to have retroactive effect unless their language requires this result." <u>Bowen v. Georgetown University Hosp.</u>, 488 U.S. 204, 208, 109 S. Ct. 468 (1988); <u>INS v. Enrico St. Cyr</u>, 533 U.S. 289, 316, 121 S. Ct. 2271 (2001). Congressional intent that a statute be applied retroactively must be clear and unambiguous.  <u>Enrico St. Cyr</u>, 533 U.S. at 316-317.  Those cases in which the Court has found truly retroactive effect have involved statutory language that was "so clear that it could sustain only one interpretation," as "the standard for finding such unambiguous direction is a demanding one."  <u>Id.</u>

The Supreme Court has also made clear that the mere fact that Congress provided an effective date for a statute affords no support for a claim that the statute is to be given retroactive effect. "The mere promulgation of an effective date for a statute does not provide sufficient assurance that Congress specifically considered the potential unfairness that retroactive application would produce.  For that reason, a statement that the statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." <u>Id.</u> at 317 (some internal punctuation and citations omitted).

Moreover, the Third Circuit has already stated that IDEA-2004 is not to be applied retroactively.  <u>Lawrence Township Bd. of Educ. v. New Jersey</u>, 417 F.3d 368, 370 (3d Cir. 2005)("amendments to IDEA have prospective application only").  <u>See</u>, <u>also</u>, <u>J.M. v. Kingsway Regional Sch. Dist.</u>, No. Civ. A. 04-4046, 2005 WL 2000179 (D. N. J. Aug. 18, 2005) (same);

Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, n.3 (3d Cir. 1999) (same determination regarding IDEA-1997 amendments as lacking retroactive effect)[5]; cf. Jaffees v. Council Rock Sch. Dist., No. Civ. A. 06-0413, 2006 WL 1722416 (E. D. Pa. June 19, 2006).

Courts of Appeals outside of the Third Circuit have also confirmed that "[a] newly enacted statute that shortens the applicable statute of limitations may not be applied retroactively to bar a plaintiff's claim that might otherwise be brought under the old statutory scheme because to do so would be manifestly unjust." In re Apex Exp. Corp., 190 F.3d 624, 642-43 (4th Cir. 1999)(affirming that the "retroactive reduction in the statute of limitations" runs against the presumption of only prospective applicability); Chenault v. United States Postal Serv., 37 F.3d 535, 539 (9th Cir.1994); Hartford Caves. Ins. Co. v. FDIC, 21 F.3d 696, 748 (5th Cir. 1994) (retroactive application of the new statute of limitations would extinguish claims which were valid before the statute's effective date and deprive plaintiff of a forum, even though it acted properly under law existing at the time its claims arose); Two Rivers v. Lewis, 174 F.3d 987, 996 (9th Cir.1999) (refusing the retroactive application of a shorter statute of limitations without providing petitioner with a reasonable time to file suit after the amendment).  Indeed, retroactive application of a longer statute of limitations is equally repugnant. Saint Francis College v. Al-Kharaji, 481 U.S. 604, 608-09 (1987) (retroactive lengthening of the statute of limitations to permit a claim that had expired under the previously applicable, shorter statute of limitations was manifestly inequitable).

The Supreme Court and other federal courts have thus spoken with clarity that statutes will not be retroactively applied absent the clearest of congressional language which mandates such

---

[5]  Warren G. was consistent with decisions of the other Circuits addressing the retroactive application of amendments to the IDEA. See, Peter v. Wedl, 155 F.3d 992, 998-99 (8th Cir.1998); Muller v. Committee on Special Educ., 145 F.3d 95, 97 n.1 (2d Cir.1998); Sellers v. School Bd., 141 F.3d 524, 526 n.2 (4th Cir.1998), cert. denied, 525 U.S. 871, 119 S.Ct. 168, 142L.Ed.2d 137 (1998); Tucker v. Calloway County Bd. of Educ.,136F.3d 495, 501 (6th Cir.1998) (court refused to apply amendments retroactively to conduct that occurred prior to the effective date of the amendments); Fowler v. Unified Sch. Dist. No. 259, 128 F.3d 1431,1436 (10th Cir.1997); Heather S. v. Wisconsin,125 F.3d 1045, 1047 n.1 (7th Cir. 1997); Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 247 n.1 (5th Cir. 1997).

retrospective application.  No such language appears in IDEA, and the Third Circuit has already

found IDEA to have no retroactive application.  <u>Lawrence Township</u>, 417 F.3d at 370.  As the

<u>Chenault</u> court instructed, "[a] newly enacted statute that shortens the applicable statute of

limitations may not be applied retroactively to bar a plaintiff's claim that might otherwise be

brought under the old statutory scheme because to do so would be manifestly unjust." <u>Chenault,</u>

37 F.3d 535 (9th Cir. 1994).  Thus, the conclusion of the state administrative process that IDEA-

2004 retroactively and silently abolished pre-existing claims was totally unsupportable under the

language of the statute and the abundant Supreme Court, Third Circuit, and District Court

authority concerning this issue.  It is beyond dispute that IDEA-2004 does not affirmatively state

that it is to be applied retroactively; indeed, the Third Circuit expressly found to the contrary in

<u>Lawrence Township</u>, 417 F.3d at 370, a decision which is fully consistent with the decisions of

the Supreme Court concerning retroactive application of statutes.

 Retroactive application of IDEA's new time limitation has also been recently rejected by

three federal courts in Pennsylvania.  In <u>Terance D.</u>, Judge Yohn correctly held that IDEA-2004

may not be applied retroactively to limit claims existing before its effective date, even where

plaintiffs requested a due process hearing after the effective date of IDEA-2004. Judge Yohn

noted a consensus among the courts that statutes of limitations contained in newly enacted statutes

may not be applied retroactively absent "express congressional intent." <u>Id.</u> at *6.  Finding such

express intent lacking in IDEA-2004, and relying on the Third Circuit's pre-IDEA-2004 holding

in <u>Ridgewood Bd. of Educ. v. N.E.</u>, 172 F.3d 238, 250 (3d Cir.1999)(compensatory education

claims under IDEA-1997 were not subject to a statute of limitations),[6] Judge Yohn correctly held

that claims prior to the effective date of IDEA-2004 were not retroactively barred by IDEA-2004's

limitations period.  Even more recently, in <u>Laura P. v. Haverford Sch. Dist.</u>, 2008 WL 5000461

---

  [6] Judge Yohn also noted that while the state and federal courts disagreed on the issue,
every federal district court to consider whether a SOL applied to compensatory education claims
under IDEA-1997 held that <u>Ridgewood</u> controlled, and that no statute applied to these claims.
<u>Terance D.</u>, 370 F.Supp.2d at 744.

(E. D. Pa. Nov. 21, 2008) after undertaking a thoughtful and thorough analysis, Judge Sanchez followed Tereance D. in holding that IDEA-2004's two year limitations period may not be retroactively applied to claims arising before IDEA-2004's effective date. Additionally, Judge Fullam, also following Tereance D., recently issued an Order denying a school district's Motion for Judgment on the Pleadings on the statute of limitations issue, reversing the decision of the administrative process and permitting plaintiffs' claims arising prior to IDEA-2004's effective date to proceed. Zoe S. v. West Chester Area Sch. Dist., No. Civ. A. 06-3985. (Exhibit "A").

Finally, because IDEA is a remedial statute designed to protect a class of children with disabilities, it must be construed liberally in favor of the protected class, and exemptions from the protections of the statute (such as excluding claims via a silently retroactive statute of limitations) must be narrowly construed. Markowitz v. Northeast Land Co., 906 F.2d 100, 105 (3d Cir. 1990); Smith v. Fidelity Consumer Discount, 898 F.2d 896, 898 (3d Cir. 1990); William v. Empire Funding, 109 F.Supp. 2d 352, 357 (E. D. Pa. 2000). Therefore, claims which existed prior to the effective date of the Act are unaltered by IDEA-2004, and the overwhelming weight of authority holds that such claims are not barred by any time limitation.

It is anticipated that the District will cite the decision in P.P. v. West Chester Area School District, 557 F.Supp.2d 648 (E. D. Pa. May 29, 2008), which has been appealed by this office to the Third Circuit, in support of retroactive application of IDEA's limitations period. The P.P. decision, which has thus far been followed only by this Court in its decision in Evan H. v. Unionville-Chadds Ford School District, No. Civ. A. 07-4990, 2008 WL 4791634 (E. D. Pa. Nov. 4, 2008) failed to address the critical analysis of retroactivity required by the Supreme Court discussed below. Rather, despite its own explicit finding that "the parties **do agree that the 2004 Amendments to the IDEA have no retroactive application**," 557 F.Supp.2d at 660 (emphasis added), the court completely sidestepped the retroactivity issue, and in so doing improperly condoned the incorrect application by the administrative process of a two year time limitation in IDEA-2004 to claims arising before July 1, 2005. Indeed, the Court limited its analysis of the IDEA statute of limitations issue to whether the plaintiffs filed their due process request after the

9

effective date of the Act, and whether the exceptions to the two year time limitation in IDEA-2004 had been established.

### 2. The Family's Claims Under Section 504 Are Subject to Tolling Principles

The Family brought their due process complaint under both IDEA and Section 504. No new statute of limitations under IDEA-2004 may be applied to limit claims under Section 504, retroactively or otherwise. Indeed, IDEA-2004 specifically states that it may not be "construed to restrict or limit the rights, procedures, and remedies available under...[Section 504 of] the Rehabilitation Act of 1973...." 20 U.S.C. Section 1415(l), except with respect to exhaustion requirements for relief also available under IDEA which are not applicable here.

The P.P. court held that a two year statute of limitations applies to Section 504 claims, consistent with Pennsylvania's personal injury limitations period. While the court acknowledged that Pennsylvania's minority tolling statute applies to claims of minors under federal statutes, like Section 504, the court held that minority tolling did not apply to P.P.'s Section 504 claims because it concluded that P.P. "is still a minor and has not asserted claims on his own behalf."[7]

Section 504 does not have a statutory limitations period. Historically, Section 504 has not only borrowed state tort limitations periods, but also state minority tolling principles. Sullivan v. Pittsburgh, 811 F.2d 171 (3d Cir. 1987); Saylor v. Ridge, 11 NDLR 293 (E.D. Pa. 1998); Hickey v. Irving Ind. S.D., 976 F.2d 980 (5th Cir 1992) (minority tolling).

The courts have also recognized the continuing violation doctrine and equitable tolling are applicable under Section 504. Pecinousky v. Lancaster, 1991 U. S. Dist. Lexis 9742 (W.D. Wis. 1991); Curry v. U.S. Postal Service, 583 F. Supp. 334, 335 (S.D. Ohio 1989). Indeed, many courts have held that federal statutes such as Section 504 are generally subject to equitable tolling

---

[7] In the instant matter, the Family's Complaint reflects that the minor, Candiss C., is a named Plaintiff, and Deborah A.'s claims are clearly distinguished. Moreover, the fact that Candiss is a minor is precisely why Pennsylvania's minority tolling principles must be applied to her Section 504 claims.

principles. <u>Doherty v. Teamsters Trust Fund Pension</u>, 16 F.3d 1386, 1393 (3d Cir. 1994)(citing <u>Irwin v. Department of Veterans Affairs</u>, 498 U.S. 89, 95-96, 111 S. Ct. 453, 457-458, 112 L. Ed.2d 435 (1990)). These decisions allow for the application of equitable tolling principles to extend the statute of limitations well beyond the statutory framework in some common circumstances, including but not limited to, misrepresentation by the defendant, plaintiff's lack of knowledge (discovery rule), inability to timely file, application of Pennsylvania's minority tolling provision, and continuing violations.  <u>See</u>, <u>Smith v. Shalala</u>, 910 F. Supp. 152 (D. N. J. 1995) (Social Security Act's statute of limitations of three years, three months and fifteen days to file amended income information tolled up to five years for claimant's inability to file due to spousal abuse); <u>Hughes v. United States</u>, 263 F.3d 272, 278 (Federal Tort Claims Act's two-year statute of limitations in medical malpractice claim tolled to date plaintiff knew or should have known the cause of his injury); <u>Longenette v. Krusing</u>, 322 F.3d 758, 767 (3d Cir. 2003) (Tariff Act's five-year statute of limitations tolled allowing a governmental entity to pursue forfeiture claim that was more than ten years old); <u>Albright v. Keystone Rural Health Center</u>, 320 F. Supp.2d 286, 289 (M. D. Pa. 2004)(holding Federal Torts Claims Act's two-year statute of limitations tolled in medical malpractice case where <u>minor plaintiff</u> did not know nor had reason to know defendant was federal entity and citing <u>Irene and Gary B. v. Philadelphia Academy Charter Sch.</u>, No. Civ. A. 02-1716, 2003 WL 24052009 (E. D. Pa. Jan. 29, 2003),wherein the court expressed great reluctance to abrogate Pennsylvania's codified law dictating that the statute of limitations does not begin to run against a minor until the age of majority); <u>West v. Philadelphia Electric Co.</u>, 45 F.3d 744 (3d Cir. 1994) (300 day statute of limitations for administrative filings tolled for racially-based hostile work environment where acts were ongoing, allowing plaintiff to recover for harassment that occurred during previous four years); and <u>Diaz v. Schultz</u>, 841 A.2d 546, 549 (Pa. Super. 2004) (court applied Pennsylvania discovery rule to toll limitations period for defendant's active concealment until after the limitations period had expired; court determined that <u>intentional</u> concealment was not necessary, all that was required was evidence to establish that one party actively misled another party).

District Courts across Pennsylvania have recognized the applicability of tolling principles to claims of children brought under federal statutes, including Section 504.  For example, in McKellar v. Commonwealth of Pennsylvania Dep't. of Educ., No. Civ. A. 98-4161, 1999 WL 124381 (E. D. Pa. Feb. 23, 1999), the minor plaintiff brought claims under Section 504, IDEA, the Americans with Disabilities Act and 42 U.S.C. Section 1983 ("Section 1983") which the defendant asserted were barred by a statute of limitations.  The court held that because Pennsylvania law does not allow a statute of limitations to begin to run against a potential plaintiff during his minority, the minor plaintiff's claims could not be time-barred.  Id. at *4. See, also, Susavage v. Bucks County Sch. Intermediate Unit, No. Civ. A. 00-6217, 2002 WL 109615 (E. D. Pa. Jan. 22, 2002) (recognizing that a statute of limitations does not begin to run against a potential plaintiff until the age of 18); In Jeffrey Y. v. St. Mary's Area Sch. Dist., 967 F. Supp. 852 (W. D. Pa. 1997), the court applied the doctrine of minority tolling in damages action brought under IDEA and Section 1983.  In Irene B., the court found the child plaintiff's IDEA and related actions to be timely due to tolling for minority.  Irene B., 2003 WL 24052009.  Cf. Jonathan T. v. Lackawanna Trail Sch. Dist., No. Civ. A. 03-522, 2004 WL 384906 (M. D. Pa. Feb. 26, 2004)(applying tolling until age 21 for child's request for due process hearing seeking compensatory education under IDEA). See, also, Robert R. v. Marple Newtown Sch. Dist., No. Civ. A. 05-1282, 2005 WL 3003033 (E. D. Pa. Nov. 8, 2005), in which the court recognized the continuing violation principle to extend the statute of limitations for compensatory education under IDEA for several years.  The P.P. decision is inapplicable in light of the separate minor's claims at bar, and this Court should apply minority and other tolling principles to Candiss's claims under Section 504.

### 3.  IDEA-2004 Does Not Contain an Automatic, Inflexible Two Year Limitations Period

Even if IDEA-2004's limitations period is permitted to apply retroactively (and even if it were somehow to be applied to Section 504 claims), IDEA-2004 does not contain an automatic, inflexible two-year limitations period as propounded by the District.  Rather, IDEA-2004

12

establishes **two district time periods** independent of any other statutory exceptions – the time within which a parent must request a due process hearing, <u>and</u> the time period of alleged inappropriate education which a Hearing Officer must consider at the hearing. Even if IDEA-2004 could have retroactive application to claims existing prior to July 1, 2005, and it cannot, the language of the Act does not create anything like the strict, inflexible "two year statute of limitation" the District suggests. In evaluating the complex limitation period established by IDEA-2004, it is critical to first review the specific language of the statute contained in **all three relevant** subsections of the Act.

The first applicable subsection, 20 U.S.C. Section 1415 (f)(3)( C), sets forth the time period for **actual filing of the due process complaint** as follows:

> "TIMELINE FOR REQUESTING HEARING: A parent or agency **shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint,** or, if the State has an explicit time limitation for requesting such a hearing under this part, in such time as the State law allows." (emphasis added)

The second applicable subsection requires a Hearing Officer to **hear and adjudicate a complaint:**

> "which sets forth an alleged violation that occurred **not more than 2 years before the date the parent or public agency knew or should have known about the alleged action  that forms the basis of the complaint**, or, if the State has an explicit time limitation for presenting such a complaint under this part, in such time as the State law allows, except that the exceptions to the timeline described in subsection (f)(3)(D) shall apply to the timeline described in this paragraph."

20 U.S.C. Section 1415(b)(6)(B)(emphasis added).

The Act therefore does not create a simple "two year statute of limitations," but rather a two year period to bring a claim <u>after</u> the parent knew (or reasonably should have known) of the existence of the claim, and a <u>separate</u> two-year time period <u>before</u> the parent or agency knew (or reasonably should have known) of the actual injury to the child, with the latter time period involving the adjudication of the appropriateness of the educational program.

While Sections 1415(b)(6) and 1415(f)(3)(C) and (D) are linguistically challenging to construe, they nevertheless clearly create a legislative framework which is not a mechanical

application of a two-year period. While Section 1415(f)(3)(C) involves <u>prospective</u> time computation by requiring a parent to <u>request a due process hearing</u> within "two years of the date the parent knew or should have known about the alleged" violation of IDEA, Section 1415(b)(6) involves <u>retrospective</u> time computation by delineating the issues which must be <u>adjudicated at the hearing</u>: a "violation that occurred not more than two years <u>before</u> the date the parent or public agency knew or should have known about the alleged" violation of IDEA (emphasis supplied). Consequently, IDEA's new time limits have two preliminary components: first, a parent has two years to initiate due process <u>after</u> the time that the parent is aware of the violation; second, the Hearing Officer must then consider and adjudicate all violations which occurred two years <u>before</u> any date that the school district knew or should have known of the violation, thus creating a much longer time frame than a simple two years for determination by the Hearing Officer of allegations of violations of IDEA.[8]

Therefore, because the "knew or should have known" standard applies to the educational agency, Hearing Officers must now determine, when faced with a "statute of limitations" issue, the point in time at which the school district "should have known" of the IDEA violation, thus requiring Hearing Officers to decide whether the district improperly failed to evaluate, inadequately evaluated the child; and/or created deficient Individualized Education Programs such that the district should have known of the IDEA violations at any time before the two-year period applicable to the parental request for a hearing.

Finally, IDEA includes a third component requiring the Hearing Officer to determine whether exceptions exist to the time limits above due to the District's misrepresentations or

---

[8]  The use of two applicable time periods to identify a single limitations period is not uncommon; for example, the time period in Pennsylvania for a minor to bring a medical negligence claim includes the period of minority (i.e., the time until the minor reaches the age of eighteen), plus the two years typically applicable to negligence claims.  42 Pa. Const. Stat. Section 5533(b)(1)(i)-(ii); <u>Santos v. U.S.</u>, 523 F.Supp.2d 435, 437 (M.D. Pa. 2007); <u>Fancsali v. University Health Center of Pittsburgh et al.</u>, 563 Pa. 439, 761 A.2d 1159 (Pa. 2000).

withholding of information.  Section 1415 (f)(3)(D). The <u>third</u> subsection, 20 U.S.C. Section 1415 (f)(3)(D), references broad <u>exceptions</u> which permit claims well beyond the two distinct periods noted above relating to the parent's knowledge of the existence of the legal claim. Section 1415(f)(3)(D) permits parents to raise claims during a period where the district failed to provide information mandated by IDEA, including: "specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint" or "the local educational agency's withholding of information from the parent that was required under this part to be provided to the parent."

Finally, and critically, the unfairness of retroactive application of a statute of limitations under IDEA-2004 and/or application of such limitations period as an automatic, inflexible two-year period is clearly highlighted in cases, where, as here, the claim involves a violation of a school district's obligation to timely evaluate and identify all children it should reasonably suspect of needing special education services. See, <u>Ridgewood Bd. of Educ. v. N.E.</u>, 172 F.3d 238 (3d Cir. 1999); <u>W.B. v. Matula</u> 67 F.3d 484 (3d Cir. 1995).

School districts are required to properly identify all eligible children, regardless of the severity of their disability under Child Find, which is mandated under both IDEA and Section 504.  34 C.F.R. Sections 300.111 and 104.33; 20 U.S.C 1412(a)(3)(A) and (B).  Under these statutes and their regulations, school districts have a continuing obligation to properly evaluate and accurately identify all students who are reasonably suspected of having a disability under IDEA or Section 504.  <u>Id.</u>  <u>Ridgewood,</u>172 F.3d 238; <u>W.B. v. Matula</u>, 67 F.3d 484 (3d Cir. 1995); <u>Palmyra Bd. of Educ. v. F.C.</u>, 2 F.Supp.2d 637 (D.N.J. 1998); <u>T.B. v. School Dist. of Philadelphia</u>, 1997 WL 786448 (E. D. Pa.1997); <u>Punxsutawney Area Sch. Dist. v. Kanouff</u>, 633 A.2d 831 (Pa. Cmwlth. 1995).

The first consideration under Child Find involves the District's initial obligation to commence an evaluation of a student whom the District should reasonably suspect to be disabled.  Under this first aspect of Child Find, the District's obligation to serve a student commences within a reasonable time after the District should have suspected the child to be

disabled, the "reasonable time" being allowed to the District to conduct an evaluation, identify the student as disabled, and formulate an appropriate program for the child. Id. The second aspect of Child Find involves the actual identification of every student with disabilities. Id. See also, M.C. v. Central Regional School District, 81 F.3d 389 (3d Cir. 1996); Big Beaver Falls Area School District v. Jackson, 615 A.2d 910 (Pa.Cmwlth.1992).

Candiss was retained by the District in second grade "when it became evident that she had difficulties learning." P-18.[9]  Despite its acknowledgment of these learning difficulties, the District failed to conduct an evaluation to determine if Candiss was eligible for special education services in September, 1999, when Candiss was beginning her second year of second grade. P-18.  It was not until November of 2002, following the involvement of the Pennsylvania Department of Education, that the District finally conducted a multidisciplinary evaluation of Candiss.  P-18; D-3.  Thus, from September of 1999 until January 31, 2003, when the District finally developed an IEP for Candiss, the District improperly failed to identify Candiss as needing special education and failed to offer her an appropriate program.  Due to the District's failure to timely identify Candiss, she did not receive the special education services to which she was entitled, and which she needed for the previous three and a half years (during which time she failed to make meaningful educational progress).[10]

---

[9]  Citations to the administrative record in this brief will be made as follows: Parents' Exhibits from the due process hearing will be designated as "P-" followed by the number of the Exhibit; references to School District Exhibits will be designated as "D-" followed by the number; references to Notes of Testimony from the due process hearing will be designated as "N.T.-" followed by the page number; references to the Hearing Officer will be designated as "HO-" followed by the page number. References to the Appeals Panel opinion will be designated as "AP-" followed by the page number.  These documents are contained in the administrative record in this matter which was received by the clerk's office on July 14, 2008. (Docket Entry #2 under case number 08-2613)

[10] The Hearing Officer did not permit the Family to present evidence of their claims prior to July 25, 2005, which would have included further evidence of the District's Child Find violation which the Family will present if their remand request is granted.

The school district possesses or should possess expertise in recognizing children who exhibit tendencies which may require special education instruction.  However, where, as here, the School District fails to timely evaluate and program for these children over many years, under a strict, two-year time limitation rule, such children might not be identified, if at all, until as late as the high school years, when their needs will have magnified due to the cumulative effect of being denied appropriate special education and become much more difficult to remediate.  Nevertheless, their claims will be truncated to a two-year period.  It is in these cases of longstanding failure by school districts resulting in the most serious harm that injustice of such a rule is most manifest.

**4.  The Family Has Satisfied the Statutory Exceptions of IDEA-2004 to Any Limitations Period Under IDEA**

The District made specific misrepresentations to Candiss's mother pertaining to Candiss's educational progress.  The District also withheld information from Candiss's mother that it was required to provide under the IDEA. Due to these actions on behalf of the District, the statute of limitations under the IDEA may not be applied to Candiss C.'s claims for compensatory education from the 1999-2000 school year through the 2004-2005 school year.

The District made numerous specific misrepresentations to Candiss's mother regarding Candiss's educational progress. Candiss's mother expressed her concerns at all of Candiss's IEP meetings that: 1) Candiss's reading skills were far below her grade level placement; 2) Candiss's reading problems affected all other academic areas; and 3) the District was merely "pacifying" Candiss by helping her complete assignments but was not providing her instruction to teach her to become a better reader.  N.T. 242.   The District's response to Candiss's mother's concerns was to repeatedly tell her Candiss was doing well, and to provide her with test results demonstrating Candiss's so-called progress.  N.T. 243.

The District's October 26, 2004 IEP specifically misrepresented to Candiss's mother that "Candiss has made significant progress during the past school year in all areas...she has increased her reading level by 1-2 years."  P-11.  A thorough review of Candiss's previous IEPs

reflected, however, that Candiss was functioning on a fourth grade level in Reading in January of 2003.  P-16.  Almost two years later, in October of 2004, Candiss was <u>still</u> functioning on a fourth grade level in Reading, and on the second grade level in Word Identification! P-11.

Even at a June 8, 2007 IEP meeting, the results of Candiss's scores on the May, 2007 Woodcock Reading Mastery test were only partially presented to Candiss's mother (whereas previously the Woodcock scores has been listed for each subtest), thereby misleading her that Candiss had made progress.  P-1; D-15.  Specifically, these results demonstrated Candiss's regression in the area of word comprehension of <u>more than one year in a six month time period</u>; however, this information was simply left out of the June 8, 2007 IEP altogether.  P-10; D-15; N.T. 120-122. The District clearly misrepresented the results of Candiss's Woodcock Reading Mastery Test to reflect only the "progress" the District chose to present, and failed to make Candiss's mother aware of the significant regression Candiss's subtest scores demonstrated.  P-1; P-10; D-15.

The District will likely contend that because Candiss's mother filed a complaint with the Pennsylvania Department of Education in August of 2002, that she was aware of her right to request a due process hearing.  However, Candiss's mother was not aware and the District did not make her aware of her right to request a due process hearing. D-3.  Indeed, Candiss's mother testified that had she known she had that right, it would not have taken her so long to request a hearing.  N.T. 335-336.[11]  Furthermore, the Pennsylvania Department of Education resolved the complaint, which was based on the District's failure to respond to Candiss's mother's written request for an evaluation of Candiss.  D-3.  The District conducted the evaluation and began providing special education services to Candiss; thus, a due process hearing never became necessary for the issue presented to the Department of Education and Candiss's mother was

---

[11] Indeed, this Court has recognized the applicability of IDEA-2004's statutory exceptions where the parent has been prevented from requesting a due process hearing by the misrepresentations or withholding of information by the District.  <u>Evan H.</u>, 2008 WL at *6.

never made aware of her rights to a due process hearing as a result of her complaint to the Department of Education.  P-18; P-16.

The District also repeatedly withheld information it was required to provide to Candiss's mother.  The District failed to conduct <u>any</u> assessments as part of Candiss's initial ER dated November 26, 2002.  P-18.  Consequently, Candiss and her mother were not provided with the necessary information concerning Candiss's Specific Learning Disabilities in Reading and Writing in order to determine the content of Candiss's IEP.  P-18.  The District repeatedly failed to provide accurate, objective and measurable present levels of education for Candiss to her mother. P-1; P-3; P-7; P-11; P-16; P-17.  As a result, Candiss's mother was unequipped to effectively participate as an IEP team member for her daughter. N.T. 331-333. Indeed, Candiss's mother testified that she didn't really understand Candiss's IEPs, stating "They're too complicated. They say things over and over again. So I don't know if it's a plus for Candiss or a negative for Candiss, but all I know is, I see the end result of Candiss where she can't do her homework by herself."  N.T. 333.

Candiss's mother was never told at any IEP meeting, nor at a March, 2007 facilitation meeting, of her option to request a due process hearing.  N.T. 335-336.  Nor was Candiss's mother ever advised by the District of any statute of limitations period regarding her right to request a due process hearing on behalf of her daughter.  All of the Procedural Safeguards Notices ("PSNs") provided to Candiss's mother from the 1999-2000 school year until June of 2007 failed to contain notice of a statute of limitations period.  P-12; P-15.  In fact, the District inexcusably and repeatedly provided Candiss's mother with PSNs pertaining to the IDEA-1997 even as late as two years after the IDEA-2004 amended IDEA-1997 on July 1, 2005.  P-12; P-15.  This Court has held that the failure to provide appropriate procedural safeguards notices - to include information on filing complaints and requests for a due process hearing - may be sufficient to invoke IDEA-2004's exceptions.  <u>Evan H.</u>, 2008 WL at *7.

For all of the foregoing reasons, the Family respectfully requests that this Court

19

enter the proposed Order "A" attached hereto, and remand this matter to the administrative

process for consideration of the Family's claims prior to July 25, 2005 without imposition of a

limitations period.

## IV.  MOTION FOR JUDGMENT ON ADMINISTRATIVE RECORD

**A.  The District Denied Candiss a FAPE During the Period Considered by The Administrative Process, the 2006-2007 School Year**

The purpose of the IDEA is to ensure that "all children with disabilities have available to

them a free and appropriate public education that emphasizes special education and related

services designed to meet their unique needs and prepare them for further education,

employment, and independent living."  20 U.S.C. Section 1400 (d)(1)(A).  The IDEA and its

regulations establish a comprehensive format by which a child with a disability must be

evaluated, his classification must be determined and an appropriate program of special

education with "related services" must be developed and implemented.  The program must be

developed jointly by school district officials and each disabled child's parents through an

Individualized Education Program ("IEP").  The IEP must be reasonably calculated to afford the

child the opportunity to receive "meaningful educational benefit."  Shore Regional High Sch.

Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004); Ridgewood Bd. of Educ. v. N.E., 172

F.3d 238, 247 (3d Cir. 1999); Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171,

184 (3d Cir. 1988).  The rights bestowed upon students and families by the IDEA are

enforceable through multi-level administrative and judicial procedures.  20 U.S.C. Section

1415; 34 C.F.R. Sections 300.507; 300.511- 300.516.

In Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-

207 (1982), the Supreme Court declared that in order to meet the statutory requirements of

FAPE under the IDEA, school districts must: 1) conform to the procedural requirements of the

Act; and 2) ensure that the eligible student's IEP is reasonably calculated to yield meaningful

benefit.  The Supreme Court has determined the IEP to be the "primary vehicle" and the

"centerpiece of the statute's education delivery system for disabled children," and to embody the

substantive standard for school districts' obligation to provide FAPE to children with disabilities.  Honig v. Doe, 484 U.S. 305, 311 (1988).  Therefore, when an eligible child with a disability is denied an appropriate IEP and the special education and related services required, described and promised therein, the child is denied FAPE.

The Third Circuit Court of Appeals has also clarified that under the IDEA, a child with a disability is entitled to a program that is reasonably calculated to confer meaningful educational benefit that is more than trivial.  Polk, 853 F.2d 171; Oberti v. Board of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1213 (3d Cir. 1993); Ridgewood, 172 F.3d at 247.  In order to provide meaningful benefit, a child's IEP must be tailored to the unique, individual needs of the child consistent with the child's potential.  34 C.F.R. Section 300.320(a).  It is abundantly well settled that "education" extends beyond discrete academic skills, and includes the social, emotional, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential.  M.C. v. Central Regional Sch. Dist., 81 F.3d at 393-394;  Polk, 853 F.2d at 181-182; Kruelle v. New Castle County Sch. Dist., 642 F.2d 687, 693 (3d Cir. 1981); Armstrong v. Kline, 629 F.2d 269 (3d Cir. 1980); Bucks County Public Sch. v. Department of Educ., 529 A.2d 1201 (Pa. Cmwlth. 1987); Big Beaver Falls Area Sch. Dist. v. Jackson, 615 A.2d 910 (Pa. Cmwlth. 1992). Therefore, for an IEP to be appropriate, it must offer a child the opportunity to make progress which is "meaningful" in all relevant domains under IDEA, including behavioral, social and emotional.  M.C., 81 F.3d at 394; Ridgewood, 172 F.3d at 247.

While the administrative process barred the Family's claims prior to July 25, 2005, it did find that the District violated Candiss's right to FAPE during the 2006-2007 school year and therefore awarded Candiss five and one half (5 ½)  hours per day of compensatory education from November 2006 to the end of the 2006-2007 school year. The District has appealed the Hearing Officer's award of compensatory education for the 2006-2007 school year, and the

Family has appealed the failure of the administrative process to award Candiss compensatory education during the Summer of 2007 as ESY services.[12]

**1.   The District based its IEPs for the 2006-2007 school year on a deficient ER.**

Under the IDEA, a school district must complete an evaluation of children suspected of needing special education services within sixty (60) calendar days of receiving parental consent for the evaluation, and must have an IEP in place at the beginning of each school year for every

---

[12]   Extended school year services ("ESY") are special education and related services that are provided to a child with a disability beyond the normal school year of the public agency in accordance with the child's IEP at no cost to the parents of the child.  34 C.F.R. Section 300.106; 20 U.S.C. 1412(a)(1).  A school district  must ensure that ESY is available as necessary to provide FAPE. 34 C.F.R. Section 300.106.  A school district may not limit extended school year services to particular categories of disability, or unilaterally limit the type, amount, or duration of those services.  Id.

School districts are required, at each IEP meeting for a student with disabilities, to determine whether the student is eligible for ESY services and if so, make subsequent determinations about the services to be provided.  22 Pa. Code Chapter 14.132.  In considering whether a student is eligible for ESY services, the IEP team must consider the following factors; however, no single factor will be considered determinative:

(i) *Regression*——whether the student reverts to a lower level of functioning as evidenced by a measurable decrease in skills or behaviors which occurs as a result of an interruption in educational programming.

(ii) *Recoupment*——whether the student has the capacity to recover the skills or behavior patterns in which regression occurred to a level demonstrated prior to the interruption of educational programming.

(iii) Whether the student's difficulties with regression and recoupment make it unlikely that the student will maintain the skills and behaviors relevant to IEP goals and objectives.

(iv) The extent to which the student has mastered and consolidated an important skill or behavior at the point when educational programming would be interrupted.

(v) The extent to which a skill or behavior is particularly crucial for the student to meet the IEP goals of self-sufficiency and independence from caretakers.

(vi) The extent to which successive interruptions in educational programming result in a student's withdrawal from the learning process.

(vii) Whether the student's disability is severe, such as autism/pervasive developmental disorder, serious emotional disturbance, severe mental retardation, degenerative impairments with mental involvement and severe multiple disabilities.

Id.

exceptional child in its jurisdiction.  20 U.S.C. Section 1414 (a)(1)(C); 34 C.F.R. Section 300.301©, 300.323 (a); 22 Pa. Code Section 14.123.  The evaluation must encompass all suspected areas of the child's disability.  20 U.S.C. Section 1414 (b)(3)(B); 34 C.F.R. Section 300.304 (c)(4).  It must also be sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified. 34 C. F. R. Section 300.304 (c)(6). After the completion of the Evaluation Report ("ER"), the District must provide the parents with a copy of the ER no fewer than ten (10) school days prior to the meeting of the IEP team, unless parents choose to waive this right and proceed to an IEP meeting sooner.  22 Pa. Code Section 14.123 (d).  Importantly, an IEP must be based upon an appropriate and comprehensive evaluation which identifies the student's complete educational needs.  East Penn Sch. Dist. v. Scott B., 213 F.3d 628 (E.D. Pa. 2000) ("an IEP cannot be appropriate if the evaluation is incomplete.")

The IEP is the cornerstone of the special education program for a student. Honig, 484 U.S. at 311; Ridgewood, 172 F.3d at 247; W.B. v. Matula, 67 F.3d 484, 492 (3d Cir. 1995); Polk, 853 F.2d at 173.  The IDEA requires that every IEP include a statement of the child's present levels of academic achievement and functional performance; a statement of measurable annual goals; a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on the progress the child is making toward meeting the annual goals will be made; a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child; a statement of the program modifications or supports for school personnel that will be provided to enable the child to advance appropriately toward attaining the annual goals, to be involved in and make progress in the general education curriculum; and an explanation of the extent, if any, to which the child will

not participate with nondisabled children in the regular class and in activities.  20 U.S.C.

Section 1414 (d); 34 C.F.R. Section 300.320.[13]

It is the District's obligation to create an appropriate IEP.  Shore Regional High Sch., 381

F.3d at 199; Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 533 (3d Cir. 1995); Oberti, 995

F.2d at 1219; Furhmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1035 (3d Cir. 1993).

Even a parent's failure to participate in a meaningful manner in the IEP process will not excuse

an inappropriate IEP.  Warren G. v. Cumberland Valley Sch. Dist., 190 F.3d 80 (3d Cir. 1999);

Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78 (3d Cir. 1996). [14]

---

[13] IDEA-1997, which applies to the Family's pre-July 1, 2005 claims, required that every IEP include: comprehensive educational levels; measurable annual goals; benchmarks or short term objectives relating to the goals; a statement of special education, related services and supplementary aids and services to be provided to the child; and an explanation of the extent to which the child will be educated with non-disabled students.  20 U.S.C. Section 1414(d); 34 C.F.R. Section 300.347.

[14] In order to establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. Ridgewood,172 F.3d at 253.  The substantive requirements of Section 504 in the education context are equivalent to the requirements of the IDEA.  James S. v. School Dist. of Philadelphia, 559 F.Supp.2d 600, 620 (E. D. Pa. 2008) (citing Molly L. v. Lower Merion Sch. Dist, 194 F.Supp.2d 422, 426 (E.D.Pa.2002)); see, also, Ridgewood, 172 F.3d at 253 ("[T]here are few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition"); Matula, 67 F.3d at 492-93 (same).
Under Section 504, a "handicapped person" is defined as "any person who has a physical or mental impairment which substantially limits one or more major life activities."  34 C.F.R. Section 104.3.  The term "physical or mental impairment" is defined as "any physical or psychological disorder such as . . . emotional or mental illness and specific learning disabilities." Id.  The term "major life activities" is defined as "functions such as caring for one's self . . . learning, and working."  Id.
Section 504 provides specific requirements for public school systems to protect all handicapped students, even those who may not qualify under the categorical listings of IDEA. Section 504 requires that "a public elementary or secondary education program shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart."  34 C.F.R. Section 104.32; Ridgewood, 172 F.3d at 253; Matula, 67 F.3d at 500-501.  The District

Candiss is a student with average cognitive abilities who has been identified with Specific Learning Disabilities in the areas of Reading and Writing.  P-18.  Due to the District's failure to offer Candiss a FAPE for the majority of her educational career, Candiss failed to make meaningful educational progress.  P-1; P-2; P-3 P-13; D-12.  In fact, at the time Candiss left the District to attend a charter school for the 2005-2006 school year, she was functioning four to five years below her grade level in Reading and Writing.  P-1; P-10.

The District improperly based all three of its IEPs for the 2006-2007 school year on a deficient ER.  P-1; P-2; P-3;  P-7; N.T. 43.   The deficiency of the E.R. renders the resultant IEP's inappropriate.  East Penn School District v. Scott B..  When Candiss reentered the District in September, 2006 following her attendance at a charter school for the 2005-2006 school year, her current ER was dated April 21, 2006, and had been completed by the charter school.  P-2.  Rather than conduct a comprehensive multidisciplinary team evaluation to assess all of Candiss's current, complete educational needs, the District chose to narrowly focus on the results from one simple reading assessment it conducted.  P-10; D-15.  This was especially egregious in light of the ever-widening gap between Candiss's reading achievement level and grade level, and the results of an independent evaluation which indicated Candiss was functioning at the fifth (5th) percentile in Spelling, twenty-first (21st) percentile in Written Expression, second (2nd) percentile in Word Reading, and first (1st) percentile in Pseudoword Decoding.  P-10; P-13; D-15.

---

must identify all children who are suspected of having a disability, and must also ensure that its evaluations to determine actual eligibility for services occur within a reasonable time after school officials are notified of a child who is likely to have a disability.  Matula, 67 F.3d at 501.23.

Under Section 504, recipients of federal funds are required to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. Section 104.33(a).  The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. Section 104.33(b).

Through testimony, the District admitted that students with Specific Learning Disabilities in Reading may have strengths in one or more components, weaknesses in other components, and that it is important to know a student's specific strengths and weaknesses in order to develop an appropriate IEP.  N.T. 48-49.  Nonetheless, the April, 2006 ER which the District utilized in order to develop all three of Candiss's IEPs for the 2006-2007 school year failed to provide any accurate indication of Candiss's functional levels with respect to phonemic awareness, decoding, vocabulary, reading fluency, or reading comprehension.  P-1; P-2; P-; N.T. 48-49.  The ER also failed to provide any indication of the level of Candiss's functional skills in the areas of written expression, spelling, math reasoning, and numerical operations.  P-2; N.T. 51.  The only information regarding Candiss's academic achievement is a reference to outdated Reading and Math assessments conducted a year and a half prior to the date of the ER.  P-2; N.T. 47.  Incredibly, the only assessment results reported in the ER were subtests of one cognitive assessment which could not have identified any relevant academic skills levels. P-2; N.T. 46.

The ER further failed to include any assessments of Candiss's social and emotional functioning.  P-2; N.T. 52.   No behavioral rating scales and no classroom observations were conducted as part of the evaluation reported in this ER.  P-2; N.T. 53, 54.  Moreover, while it recommended a Functional Behavioral Assessment, the District failed to conduct one.  N.T. 52. The District mistakenly failed to determine that further assessments of Candiss's achievement levels, social/emotional functioning, and behavioral functioning were warranted.  N.T. 55. While the District could have initiated a re-evaluation of Candiss at any time if it determined a re-evaluation was warranted, it did not.  N.T. 54-55.   These omissions individually and collectively rendered the District's ER fatally flawed and a totally infirm foundation on which to build an appropriate IEP.

**2.  The Administrative Process Correctly Held That The District's IEPs for the 2006-2007 School Year Denied Candiss a FAPE**

26

When Candiss returned to the District in September, 2006 from the charter school she attended for the 2005-2006 school year, instead of creating a new, appropriate IEP for Candiss upon her return, the District implemented the inappropriate IEP created by the charter school on November 4, 2005. D-12. This November 4, 2005 IEP included insufficient present education levels for Candiss that were more than a year old. D-12. The one vague goal of this IEP was not written in objective, measurable terms. Id. Specifically, the goal called for Candiss to "increase her reading skills so that she will become an independent reader in her academic career." Id. Because this IEP failed to provide the target level Candiss was expected to achieve, and because no baseline levels of performance were provided, it was impossible to measure Candiss's progress. Id. It further failed to consider Candiss's unique, individual needs consistent with her potential. Id.

Furthermore, the benchmarks associated with this solitary goal were too low given the information in the present education levels. Id. The present education levels of this IEP indicated Candiss was reading independently at the third grade level, but demonstrated comprehension and word attack skills at the fifth grade level. Id. The benchmarks, however, nonsensically called for Candiss to *increase* her ability to comprehend and attack words given reading material at the fourth grade level. Id.

The November 4, 2005 IEP did not identify specially designed instruction specifically associated with the reading goal. Id. Indeed, the only specially designed "instruction" described in the IEP did not consist of instruction at all, but rather merely consisted of general modifications such as: avoiding distracting stimuli, providing visual aids, and pairing visual with auditory. Id. Additionally, this IEP failed to offer Candiss ESY services although she was functioning at least three years below her actual grade level in reading at that time. Id.

After utilizing the substantially flawed November 4, 2005 IEP for two to three months, the District finally convened an IEP meeting for Candiss in November or December of 2005. P-3; D-12. It should be noted that it is unclear when the first IEP meeting took place during Candiss's 2006-2007 school year. P-3. While the IEP is dated November 3, 2006 (which just

27

comports with IDEA's timeline for the development of a subsequent IEP), the present education levels included the Woodcock Reading Mastery Test results from November 16, 2006, nine days after the IEP date.  P-3; D-15.  Moreover, the IEP dated November 3, 2006, included the signature of Candiss's mother dated a month later on December 4, 2006, indicating that she had received a copy of a Procedural Safeguards Notice.  P-3.

The IEP dated November 3, 2006 was also substantively deficient.  Id.  First, the vague goals were not measurable and failed to provide an objective, expected level of achievement. Id.  For example, one goal called for Candiss to "demonstrate fluency and comprehension in reading at grade appropriate level."  Id. While "grade appropriate" was not defined in the IEP, the District's Director of Special Education testified the "grade appropriate" level for Candiss would be ninth grade.  P-3; N.T. 66.  In her testimony, the District's Director of Special Education unconvincingly attempted to explain how Candiss would be able to read fluently and comprehend at the ninth grade level despite that she was only functioning at the fourth to fifth grade level in Reading.  P-3; N.T. 66-72.  The District's Director of Special Education admitted, however, this goal failed to specifically indicate the actual, targeted instructional level to which Candiss would progress, stating that Candiss would be expected to merely "increase" her instructional level.  N.T. 71-72.   The goal for writing in the IEP dated November 3, 2006 -- to write multi-paragraph informational pieces -- was also vague and unmeasurable, not individually tailored to Candiss's unique needs, and it failed to provide any grade level or expected level of achievement for Candiss.  P-3. The third and final goal -- to identify and describe basic facts and ideas in text -- was likewise vague, not specifically and individually tailored to Candiss's unique needs, and failed to indicate the grade level of the text Candiss would be expected to comprehend.  Id.

The ineffectiveness and inappropriateness of the goals in the IEP dated November 3, 2006 is not surprising, given the substantially inadequate present education levels utilized to develop the goals.  Id.  The information in the present education levels was limited to Candiss's functioning in the area of Reading, and even that information was woefully incomplete.  Id.

28

Specifically, the District's present education levels included only the results of Candiss's most recent Woodcock Reading Mastery Test, but failed to include the results of Candiss's previous Woodcock Reading Mastery Test that the District conducted two years earlier.  P-3; D-7; D-15. A comparison of these administrations of the same test would have provided Candiss's level of progress or regression in the areas assessed.  D-7; D-15.  This important information was nonetheless omitted from the District's IEP dated November 3, 2006.  P-3.

The Specially Designed Instruction in the District's IEP dated November 3, 2006 failed to include any <u>instruction</u> to address Candiss's significant learning disabilities in reading and writing.  <u>Id</u>.  Indeed, the very scant present education levels suggested that Candiss's overall reading level fell just at the fifth grade level, <u>four years below</u> her actual grade level placement. <u>Id</u>.  Yet, the District felt it only necessary to include two very general <u>modifications</u>: preferential seating and extension of allotted time.  <u>Id</u>.  Clearly, these modifications could not even begin to address Candiss's needs for specially designed instruction related to her Reading and Writing disabilities (especially in light of her extremely delayed level of functioning).  <u>Id</u>.  This IEP also failed to offer Candiss ESY services despite the fact she was functioning at least four years below her actual grade level in reading. <u>Id</u>.

Candiss's mother contacted the Office for Dispute Resolution (hereinafter "ODR") in January or February of 2007. P-14; N.T. 247-248. To the best of her ability, she expressed her concerns with Candiss's current IEP.  N.T. 249.  She was advised by ODR that the next step was a facilitation process whereby a neutral person would attend a meeting with Candiss's mother and the District to discuss her concerns.  N.T. 249.  A meeting with the facilitator occurred sometime between March 5, 2007 and March 29, 2007.  N.T. 250.

During the facilitation meeting, Candiss's mother expressed her concerns that Candiss was still struggling and having difficulties in school. N.T. 251.  She indicated the District was still assuring her that Candiss was progressing and everything was okay.  <u>Id</u>.  Candiss's mother expressed her disbelief in the District's assurances regarding Candiss's progress. <u>Id</u>.  She was told at the facilitation meeting that there were services being offered by the District in which

Candiss was not participating.  Id.  Candiss's mother was never made aware of these services
that were alleged to have been offered.  N.T. 251-252.  At the conclusion of the meeting,
Candiss's mother felt defeated, alone, and regrettably, angry at Candiss.  N.T. 251, 327-328.  At
the same time, Candiss's mother recognized that she should have received some type of
notification of services being offered, as well as Candiss's lack of participation, if in fact, these
incidents had occurred.  N.T. 251.

Candiss's behavioral difficulties were also discussed at the facilitation meeting in
March, 2007.  N.T. 252.  Candiss's mother felt that Candiss's behaviors were a result of her
academic frustrations, and believed the District's reliance on Candiss to ask for help when she
needed it was questionable.  Id. Despite the District's awareness of Candiss's emotional and
behavioral needs, the District never offered counseling services to Candiss during the 2006-
2007 school year, nor did the school counselor speak with Candiss's private therapist.  N.T. 259.
Following the eight disciplinary referrals Candiss received during the Fall and Winter of the
2006-2007 school year, Candiss's mother personally returned Candiss to school and met with
the teacher involved in each referral.  N.T. 264-265.  In all of these meetings, with several
different District personnel, no one ever initiated a Functional Behavioral Assessment
(hereinafter "FBA") or the development of a Behavioral Support Plan (hereinafter "BSP") for
Candiss.  N.T. 265.

Even at the conclusion of the facilitation meeting in March, 2007, the responsibility was
placed solely on Candiss herself to ask for what she needed.  N.T. 329.  No additional services
were offered, no Permission to Reevaluate form was issued, and neither an FBA nor a BSP were
resulted from the facilitation meeting.  N.T. 328-330.

The District convened another IEP team meeting on March 29, 2007, shortly following
the IEP facilitation meeting. P-7; N.T. 250.  The March 29, 2007 IEP was also fatally flawed
due to various significant deficiencies, despite the addition of some instructional levels to the
goals.  P-7.  This IEP still contained the same dreadfully deficient present education levels and

specially designed "instruction" to address Candiss's Reading and Writing disabilities that were in the IEP dated November 3, 2006. P-3; P-7.

The March 29, 2007 IEP team unbelievably failed to include or address the consistent academic and behavioral concerns reported on the District's Comprehensive Student Assistance Process (hereinafter "C-SAP") Checklist by three different teachers of Candiss, in three different subjects. P-7; P-4; P-5; P-6; N.T. 181, 225-226. These behavioral and academic concerns included "cannot work well with others," "tends to have confrontations verbally at the drop of a comment," "incomplete homework assignments," "incomplete class assignments," "poor study skills," "argumentative," "attention-getting behavior," and "verbally disruptive." P-4; P-5; P-6. The teachers' identification of these behaviors that impeded learning occurred twelve days prior to the March 29, 2007 IEP meeting, yet these concerns not part of the IEP's present education levels, nor were they addressed in the goals, specially designed instruction or related services. P-4; P-5; P-6; P-7; N.T. 83-102.

The District contended that a goal to improve Candiss's attendance somehow addressed the concerns regarding Candiss's completion of homework assignments raised by three of her teachers on the C-SAP Checklists. N.T. 93. Incredibly, the District's Director of Special Education testified, "Well...it's hard to complete homework if you're not there and good attendance, demonstrating academic ability..." N.T. 91. The District further contended this same goal also somehow addressed the behavioral concerns expressed by Candiss's teachers in the C-SAP Checklists. P-4; P-5; P-6; P-7; N.T. 91.

The March 29, 2007 IEP also failed to make any reference to any of Candiss's Disciplinary Referrals from October 24, 2006 to March 20, 2007, most of which were for disruption in school. P -7; P-8; N.T. 105. The IEP further failed to mention an incident report describing an episode where Candiss chased a male student, threw a book at him, and kicked him, following which she threatened the teacher because the teacher refused to give her the answers to the questions assigned to the class. P-9. This incident report was dated March 29, 2007, the same day the IEP was developed, yet Candiss's obvious behavioral and underlying

31

emotional needs were not referenced at all in IEP.  P-9; N.T. 105-107, 283.  In the face of these impeding behaviors, the District failed to conduct an FBA and failed to develop a positive BSP for Candiss. P-7; N.T. 110, 265.

On March 29, 2007, Deborah A. provided the IEP team with a copy of an independent psychoeducational evaluation that indicated the District's failure to provide a FAPE to Candiss and the results of that failure.  P-13; N.T. 240-241.  This independent evaluation also identified Candiss's Dysthmic Disorder and Disruptive Behavior Disorder, the social and emotional symptoms of which were not being addressed by the District's IEP for Candiss.  P-13. Candiss's mother recalled there was not much discussion at the IEP meeting concerning the independent evaluation.  N.T. 241. Deborah A.'s lay advocate was able to convince the March 29, 2007 IEP team to conduct further testing of Candiss's academic levels.  N.T. 314.

However, instead of conducting a comprehensive re-evaluation to assess Candiss's complete academic, behavior, and social/emotional needs, the District merely administered, yet again, another Woodcock Reading Mastery Test.  P-10; N.T. 314-315.  Having failed to evaluate Candiss's needs comprehensively, the District also failed to fully include the Woodcock results in the District's present education levels of the June 8, 2007 IEP.  P-1; P-10. Specifically, the District simply indicated the overall, total score rather than provide the results of each instructional area assessed.  P-1; P-10. Such an incomplete presentation was misleading, as the results of Candiss's scores on the May, 2007 Woodcock Reading Mastery test demonstrated her regression in the area of word comprehension of more than one year in a six month time period. P-10; D-15; N.T. 120-122.  This information regarding Candiss's regression was simply left out of the June 8, 2007 IEP altogether.  Furthermore, the goals in the IEP did not provide the instructional level to which Candiss was expected to advance in the areas of vocabulary, decoding, and writing. P-1; N.T. 126-128.

The District's June 8, 2007 also failed to include any goals to address the inappropriate behaviors Candiss was demonstrating  P-1; N.T. 62.  Instead, in response to the numerous disciplinary referrals that Candiss received throughout the 2006-2007 school year, the District

merely counted these instances and sent home a daily report.  P-1; P-4; P-5; P-6; P-8; P-9; N.T. 108-109. Indeed, the present education levels of the District's June 8, 2007 IEP kept track of Candiss's behavioral difficulties, and in the three month time period between March to June of 2007, Candiss was disruptive on sixteen (16) occasions, left class without permission on six (6) occasions, and fought with another student on one (1) occasion. P-1; N.T. 57-58.

Through testimony, the District agreed that if a student's behavior impedes her learning or that of others, or affects progress in behavioral or academic needs, the IEP team <u>must</u> complete an FBA and BSP. N.T. 56-57.  In fact, the June 8, 2007 IEP indicated Candiss's behaviors impeded her ability to make progress in the general education curriculum.  P-2; N.T. 59. Despite these admissions and despite the record of the frequent occurrences of Candiss's behavioral difficulties, which were also certainly impacting her ability to make educational progress, the District continuously failed to conduct an FBA or develop a BSP for Candiss.  P-1; N.T. 110, 265.

Once again, what was listed in the IEP as specially designed instruction failed to include any actual instruction.  P-1.  The District merely added the use of dictionary, computer, and flash cards. P-1.  All of these additions failed to provide Candiss the <u>specially designed instruction</u> she so desperately needed, as she was now completing her ninth grade school year and still functioning four to five years below her actual grade level in Reading and Writing.  P-1; P-10; N.T. 113.

The District rationalized that Candiss could be considered independent and self-sufficient because she was able to read at the sixth grade level, and without any evidence in the records, asserted that newspapers are written at the fifth grade level.  N.T. 118.  However, the District conceded that achieving a sixth grade reading level, which was Candiss's goal in the March 29, 2007 IEP, was far below the level the District expects for a ninth grade student and was well off the mark for graduation. P-7; N.T. 118.  Nonetheless, a goal for reading comprehension and reading fluency was removed from the June 8, 2007 IEP.  P-1; N.T. 124-125.  It was not surprising then, that Candiss's scores on the Woodcock Reading Mastery test

demonstrated her regression of more than one year in a six month time period in the area of word comprehension. P-10; D-15; N.T. 120-122.

The District's IEPs for the 2006-2007 school year failed to offer Candiss research-based reading instruction implemented in accordance with the research that supports its efficacy. P-1; P-3; P-7; N.T. 77. Incredibly, the District appeared to assert that the implementation of the District's core curriculum, which is what every student in the Philadelphia School District receives, satisfies the IDEA's requirement to provide individualized, research-based, special education instruction to students with specific learning disabilities. N.T. 76-77, 114-115.

Finally, the District inappropriately failed to offer Candiss ESY For the Summer of 2007. Indeed, Candiss's mother never even knew what ESY services were, let alone that it was an option for consideration for Candiss. N.T. 335.

### 3.   Candiss is Entitled to Compensatory Education

When a District fails to provide FAPE under both the IDEA and Section 504, it is well-settled that compensatory education is an available remedy for the student. Lester H. v. Gilhool, 916 F.2d 865 (3d Cir. 1990); Ridgewood, 172 F.3d at 250, n.11; M.C., 81 F.3d at 397. It is also well-established that compensatory education is an in-kind remedy intended to provide educational services denied to a child by a school district's failure to provide a FAPE. Lester H., 916 F.2d at 873. The Pennsylvania administrative process has repeatedly held that an award of compensatory education may be used within the reasonable discretion of the parent, i.e., Candiss's parent should be authorized to choose and access appropriate services from any reasonable educational, habilitative, therapeutic, or recreational program provider. See Special Education Appeals Panel Decisions Nos. 1563, 1499, 1179, 1122, 1098, 1082, 1070, 1054, 1046, 1042, 1027, 1024, 999, 992, 989, 961, 946, 918, 830, 766, 723, 697 (available at www.odr.pattan.net/dueprocess/AppealsDecisions.)

A compensatory education award should be computed from the time a "district knew or should have known of [the] programmatic deficiency." Ridgewood, 172 F.3d at 249; M.C., 81 F.3d at 396. The Third Circuit and the Pennsylvania Commonwealth Court have recognized

that compensatory education is available for periods of time when a student has not been provided with an appropriate IEP or where the evidence shows that the District knew or should have known of the student's need for one. Ridgewood, 172 F.3d at 249-250; M. C., 81 F.3d at 391-392; Big Beaver Falls Area Sch. Dist., 615 A.2d at 915.

Once a factfinder has determined that a student has been denied a FAPE, the remedy is automatic, as the student is entitled to full days of compensatory education for each school day that the District failed to offer her an appropriate IEP.  A child's entitlement to compensatory education in an amount equal to the deprivation was established by the Third Circuit in Lester H., a case in which the court granted day for day compensatory education for the school district's failure to provide a free appropriate public education to a student for two and one-half years. Lester H., 916 F.2d 865 (3d Cir. 1990).  The right to full days of compensatory education as a remedy for a denial of FAPE was unequivocally confirmed by Judge Sanchez in Damian J. v. School District of Philadelphia, No. Civ. A. 06-3866, 2008 WL 191176, at *7, n. 16 (E. D. Pa. Jan. 22, 2008) and again in Laura P. v. Haverford School District, No 07-5395, 2008 WL 5000461 (E. D. Pa. Nov. 21, 2008)(both citing Keystone Central Sch. Dist. v. E.E., 438 F.Supp.2d 519 (M. D. Pa. July 10, 2006)).  In Keystone, the reasoning of which was adopted in Damian J. and Laura P., the court rejected the district's claim that only partial school days of compensatory education should be awarded to remedy the district's denial of FAPE to an eligible student.  The court refused to "place an arduous and near-impossible task upon the administrative bodies to parse out the exact amount of hours [the student] was not benefitted by the inappropriate IEP." Id. at 536.  The court also held, as have many Pennsylvania appeals panels,[15] that the student's parent should determine the nature and scope of compensatory education without the need to "incorporate the District in the implementation and use of the compensatory education award [as] it is illogical to force the student to receive compensatory

---

[15]See, Special Education Appeals Panel Decisions Nos. 1563, 1499, 1179, 1122, 1098, 1082, 1070, 1054, 1046, 1042, 1027, 1024, 999, 992, 989, 961, 946, 918, 830, 766, 723, 697.

education through the District, which is the entity that failed to provide him with FAPE in the first place." Id.

Additionally, because Candiss's disabilities in Reading and Writing are pervasive, she is far delayed due to the District's failure to provide her with a FAPE. Her significant behavioral needs were not adequately addressed, and her functioning in all areas was affected throughout the day. Therefore, when computing hours of compensatory education due to Candiss, it is respectfully submitted that she is entitled to the equivalent of full days of compensatory education. In Re: The Educational Assignment of A.A. Spec Ed. Op. No. 1499; In Re: The Educational Assignment of M.L. Spec. Ed. Op. No. 1563.

**4. The Family Is Also Entitled to Compensatory Damages for the District's Failure to Provide Candiss with a FAPE**

In addition to compensatory education and reimbursement for private school tuition (among other things), a court may award monetary damages to an aggrieved parent or disabled child who brings a claim under the IDEA and Section 504. Matula, 67 F.3d at 495; Enright v. Springfield Sch. Dist., No. Civ. A. 04-1653, 2007 WL 4570970, at *10 (E. D. Pa. Dec. 27, 2007)(Slip copy) (court upheld jury award of monetary damages under IDEA and Section 504); Damian J. v. School District of Philadelphia, No. 06-3866 (monetary damages available under IDEA and Section 504); Brandon V. v. Chichester Sch. Dist. et al., No. 06-4687, 2007 WL 2155722 (E. D. Pa. July 25, 2007) (monetary damages available under Section 504). Moreover, both Section 504 and the IDEA permit recovery of reasonable attorneys fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. 1415 Section 615 (i)(3)(B); 34 C.F.R. Section 300.517; 29 U.S.C. Section 794. Therefore, the Family seeks an Order establishing their entitlement to compensatory damages, with the precise nature and amount of those damages to be determined upon further proceedings.

**V. CONCLUSION**

For the foregoing reasons, the Family respectfully requests that the Court find in favor of the Family and enter the attached proposed Orders.

Respectfully submitted,


By:  /s/_____
Gabrielle C. Sereni, Esquire
ID # 83899

/s/_____
Heather Hulse, Esquire
ID # 164134

McAndrews Law Offices, P.C.
30 Cassatt Avenue
Berwyn, PA 19312
(610) 648-9300
Attorneys for the Family

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion for Judgment on the Administrative

Record and Motion for Remand filed by Deborah A. and Candiss C., Supporting Memorandum

of Law and proposed Orders was served upon the following person in the manner indicated

below, which service satisfies the requirements of the Federal Rules of Civil Procedure:

SERVICE VIA FIRST CLASS MAIL
Miles H. Shore, Esquire
440 North Broad Street, Suite 313
Philadelphia, PA 19130

/s/_____
Gabrielle C. Sereni, Esquire

DATED:        January 30, 2009